1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| HELEN J. THORNTON *and* NATIONAL COMMITTEE TO PRESERVE SOCIAL SECURITY AND MEDICARE, | CASE NO. 2:18-cv-01409-JLR-JRC |
| Plaintiffs, | COMBINED REPORT AND RECOMMENDATION ON PLAINTIFFS' COMPLAINT & MOTION FOR CLASS CERTIFICATION |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | NOTED: FEBRUARY 21, 2020 |
| Defendant. | |

11
12
13
14
15
16
17

    This proposed class action under 42 U.S.C. § 405(g) has been referred to the undersigned

18

pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR 4(a)(4), and as authorized

19

by *Mathews, Secretary of H.E.W. v. Weber*, 423 U.S. 261, 271–72 (1976).

20

    Plaintiffs request that the court find unconstitutional the portion of the Social Security

21

Administration's statutory scheme that denies surviving spousal benefits ("survivor's benefits") to

22

the surviving partners of same-sex couples who were prohibited from marrying because of now-

23

unconstitutional state laws that banned same-sex marriage.  The matter is before the court on

24

1   plaintiffs' combined opening brief on the merits and motion for class certification.  *See* Dkt. 53.

2   Because the parties address the merits and class certification in combined briefing and because

3   both issues are ripe for decision, this combined report and recommendation addresses both the

4   merits of the parties' dispute and the motion for class certification.

5        For the reasons discussed in the merits section (*see infra*, Part II) the undersigned has

6   concluded that the statutory scheme conditioning eligibility for survivor's benefits on

7   unconstitutional state laws that forbade same-sex marriage is itself unconstitutional.  For the

8   reasons discussed in the class certification section (*see infra*, Part III) the undersigned recommends

9   that the court grant relief to a defined nation-wide class, including plaintiff Helen Thornton as class

10  representative.

11       At the heart of this case is the requirement that to obtain survivor's benefits based on the

12  higher earnings of a deceased partner, the claimant and the deceased partner must have been

13  validly married at the time of the deceased's death.  *See* 42 U.S.C. § 416(c)(1)(E), (g)(1)(E),

14  (h)(1)(A)(i).  Laws prohibiting same-sex marriage were declared unconstitutional in 2015.  For

15  certain claimants such as Ms. Thornton—who were unable to marry their same-sex partner

16  during the partner's lifetime—those claimants are now unable to obtain survivor's benefits solely

17  because of the now-unconstitutional laws barring same-sex marriage.  The question presented in

18  this case is whether the "grave and continuing harm" caused by these unconstitutional laws

19  should bar claimants from recovering survivor's benefits.

20                                    **I.  BACKGROUND**

21       For twenty-seven years, Helen Thornton and Margery Brown were partners for life in

22  every meaningful way, except sharing a marriage license.  It is undisputed that they would have

23  married, but for Washington State's law at the time, which made same-sex marriage illegal.

24

Ms. Thornton and Ms. Brown began dating in 1978 and formed a committed relationship in 1979. *See* Dkt. 34 ("AR"), at 73. They jointly rented a home in 1981 and jointly purchased a home in 1983, in Olympia, Washington. AR 73–74. Ms. Thornton gave birth to a son in 1984, and Ms. Brown adopted him. AR 74, 178. Ms. Thornton and Ms. Brown shared incomes, expenses, and liabilities. AR 73. Ms. Brown was an instructor at Evergreen State College, and Ms. Thornton worked for many years at a food co-op and later as a film programmer at an independent theater. AR 74, 90; *see also* Dkt. 46, at 9. During the course of their lives together, Ms. Brown earned more than Ms. Thornton.

They jointly advocated for same-sex rights, including taking legal action for health insurance benefits for same-sex partners of state employees. AR 75–76. During that effort, Ms. Brown was quoted in a newspaper as saying, "You can't get benefits because you can't get married," adding that she would have married Ms. Thornton if state law allowed it. AR 90. Ms. Brown and Ms. Thornton even executed a document entitled "Declaration of Marriage/Same-Sex Domestic Partnership," stating that they were "same-sex partners who are barred from a lawful marriage." AR 156–57 (emphasis removed). During the entire time that Ms. Thornton and Ms. Brown were together, the State of Washington did not allow for same-sex marriage. *See* former RCW § 26.04.010 (1998), *amended by* 2012 Wash. Legis. Serv. Ch. 3 (S.S.B. 6239).

Ms. Thornton cared for Ms. Brown through Ms. Brown's three-year battle with cancer. AR 74. Ms. Brown died in 2006. AR 76–77. At the time of her death, only a few states had begun to allow for same-sex marriage.[1]

---

[1] In 2003, the Massachusetts Supreme Court held that their state's constitution guaranteed same-sex marriage, making it the first state to legalize same-sex marriage. *See Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 2597 (2015). The Administration concedes that it is not arguing "that the earlier availability of same-sex marriage in other jurisdictions changes the fact

In the years that followed, the walls of discrimination against same-sex marriage began to crumble.  Washington State allowed for domestic partnerships in 2007 and legalized same-sex marriage in 2012—six years after Ms. Brown's death.  RCW § 26.04.010 (2012).

In 2013, the Supreme Court decided *United States v. Windsor* and held that the federal government could not deny federal benefits to same-sex couples who had legally married pursuant to a valid state law.  570 U.S. 744, 775.  In *Windsor*, the federal "Defense of Marriage Act" ("DOMA") had excluded same-sex partners from the definition of "spouse" in federal statutes—even when same-sex couples were legally married under state law.  *Id.* at 751.  The Court ruled that "DOMA seeks to injure the very class New York seeks to protect.  By doing so it violates basic due process and equal protection principles applicable to the Federal Government."  *Id.* at 769–70.

If DOMA had been allowed to stand, it could have affected "over 1,000 federal laws" and "the whole realm of federal regulations" that defined "marriage" and "spouse" by excluding same-sex partners.  *Id.* at 752, 765.  That included the Social Security statutory scheme at issue here, codified in 42 U.S.C. § 416.  *See id.* at 752 (DOMA would re-define all statutes referencing "spouses" or "marriage" to mean only opposite-sex marriages).

In June 2014, following the *Windsor* decision, Attorney General Eric Holder issued a memorandum ("the Holder Memo") announcing, "I am pleased to report that agencies across the federal government have implemented the *Windsor* decision to treat married same-sex couples the same as married opposite-sex couples for the benefits and obligations for which marriage is relevant, to the greatest extent possible under the law."  OFFICE OF THE ATTORNEY GENERAL,

---

that those who were once prohibited from marrying in their home states were, under *Obergefell*, subject to a violation of their constitutional rights."  Dkt. 63, at 34.

1  MEMORANDUM TO THE PRESIDENT:  IMPLEMENTATION OF *UNITED STATES V. WINDSOR*, at 1 (June

2  20, 2014).[2]  The Holder Memo was implemented across all federal statutes, including the Social

3  Security Act.

4       Among other changes in interpreting federal statutes, the Administration modified the

5  definitions of "widow" and "widower"—terms defined by statute to mean a woman married to a

6  man or vice-versa (*see* 42 U.S.C. § 416(c)(1)(E), (g)(1)(E))—to include a woman who was

7  married to another woman or a man who was married to another man.  *See* 20 C.F.R. § 404.345

8  ("If you and the insured were validly married under State law at the time . . . the insured died . . .

9  the relationship requirement will be met."); *see also* Dkt. 63, at 10 ("the Social Security

10  Administration's application of these statutory definitions draws no distinction between

11  surviving partners from same-sex and opposite-sex marriages[.]").  Nevertheless, the stated

12  language of 42 U.S.C. § 416(c)(1)(E) continues to define a "widow" as a woman who was

13  married to a man for nine months before he died.

14       The term "widow" . . . means the surviving wife of an individual, but only if . . .
         *she* was married to *him* for a period of not less than nine months immediately
15       prior to the day on which *he* died[.]

16  42 U.S.C. § 416(c)(1)(E) (emphasis added).  The definition of a "widower" similarly persists.

17  *See* 42 U.S.C. § 416(g)(1)(E).  Further, neither Congress by amendment nor the Administration

18  by regulation have changed the requirement that the couple had to have been validly married at

19  the time of the partner's death.

20       The case law continued to evolve after *Windsor*.  In 2014, the Ninth Circuit evaluated the

21  constitutionality of state statutes that prohibited same-sex marriage and held that state laws

22

23  _____

24  [2] https://www.justice.gov/opa/pr/one-year-after-supreme-court-s-historic-windsor-
    decision-attorney-general-holder-issues.

1   banning same-sex marriage in Idaho and Nevada violated the Equal Protection Clause of the

2   Fourteenth Amendment.  *Latta v. Otter*, 771 F.3d 456, 464–65 (9th Cir. 2014).

3          In January of 2015, shortly after her sixtieth birthday, Ms. Thornton applied for Social

4   Security survivor's benefits based on Ms. Brown's work history pursuant to 42 U.S.C. § 402.

5   *See* AR 19–22.  On December 8, 2015, the Administration denied Ms. Thornton's application

6   because Ms. Thornton "was not legally married to the insured [Ms. Brown]," AR 23, 28; *see* 42

7   U.S.C. § 416(h).

8          She requested a hearing before an administrative law judge ("ALJ").  AR 39.  Before that

9   hearing, the Supreme Court issued its ruling in *Obergefell v. Hodges*, declaring that *all* state laws

10  prohibiting same-sex marriage "are now held invalid to the extent they exclude same-sex couples

11  from civil marriage on the same terms and conditions as opposite-sex couples." __ U.S. __, 135

12  S. Ct. 2584, 2605 (2015).  The Court further held that,

13          [t]he right of same-sex couples to marry that is part of the liberty promised by the
            Fourteenth Amendment is derived, too, from that Amendment's guarantee of the
14          equal protection of the laws.

15  *Id.* at 2602.  The Court made clear that where "[s]ame-sex couples are denied all the benefits

16  afforded to opposite sex couples, . . . this denial to same-sex couples of the right to marry works

17  a grave and continuing harm." *Id.* at 2604.

18         After *Obergefell* was decided, the Administration recognized "valid same-sex marriage[s]

19  as of the date of the marriage, including during periods when the . . . state of domicile did not

20  recognize same-sex marriages." *See* Social Security Administration, Program Operations

21  Manual System GN 00210.002.[3]  Of course, this was of little avail to applicants such as Ms.

22  Thornton, who were never able to marry their chosen partner.  For those applicants, the

23

24          [3] https://secure.ssa.gov/apps10/poms.nsf/lnx/0200210002

Administration's regulations continued to rely on state laws that were in effect at the time of the insured's death, even though those laws had been declared unconstitutional:

> To decide your relationship as the insured's[4] widow or widower, we look to the laws of the State where the insured had a permanent home when he or she died . . . . If you and the insured were validly married under State law . . . at the time the insured died . . . the relationship requirement will be met[.]

20 C.F.R. § 404.345; *see also* 42 U.S.C. § 416(h)(1)(A)(i).

Even after *Obergefell*, the Administration failed to recognize any exception from the valid marriage requirement for same-sex couples who would have married, but for the state's now unconstitutional laws that prohibited same-sex marriage.

Following this statutory scheme, ALJ James Sherry issued a written decision on January 10, 2017, in which the ALJ concluded that Ms. Thornton was not eligible for survivor's benefits pursuant to the Social Security Act.  AR 13–15.

The ALJ did not question any of the evidence produced by Ms. Thornton and even acknowledged at the hearing that "the facts she is alleging in terms of their relationship are uncontroverted here.  We don't have anything that would suggest a reason to question that."  AR 175.  Among the facts that were undisputed is that but for the Washington statute prohibiting same-sex marriage, Ms. Brown and Ms. Thornton would have married at least nine months prior to Ms. Brown's death.  *See* AR 156 ("We are same-sex partners who are barred from a lawful marriage.").

On July 23, 2018, the Appeals Council denied Ms. Thornton's request for review (AR 165), making the written decision by the ALJ the final agency decision subject to judicial review.

---

[4] For purposes of this analysis, Ms. Brown is "the insured" because she was the higher wage-earner.

1   AR 5–7.  Ms. Thornton filed a complaint in this Court seeking judicial review of the ALJ's

2   written decision on September 25, 2018.  Dkt. 1.  Ms. Thornton later amended her complaint to

3   join plaintiff National Committee to Preserve Social Security and Medicare ("National

4   Committee").  *See* Dkt. 15.

5        This matter centers on the constitutionality of the Administration applying an

6   unconstitutional state law when denying survivor's benefits to applicants such as Ms. Thornton,

7   who were prohibited from marrying their same sex partner.  *See* Dkt. 53, at 15–16.

## II.  RECOMMENDATION ON THE MERITS

### A.  Jurisdiction

10       Pursuant to 42 U.S.C. § 405(g), a claimant may seek judicial review in a federal district

11  court after she obtains from the Commissioner a final judgment of her Social Security claim.  *See*

12  *Johnson v. Shalala*, 2 F.3d 918, 921 (9th Cir. 1993).  The district court has jurisdiction to enter a

13  "judgment affirming, modifying, or reversing the decision of the Commissioner of Social

14  Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The factual

15  findings of the Commissioner "if supported by substantial evidence, shall be conclusive[.]"  *Id.*

16  The court shall review questions of law with respect to "conformity with such regulations and

17  the validity of such regulations."[5]  *Id.*

### B.  Statutes at Issue and Level of Scrutiny

19       The parties disagree regarding which level of scrutiny applies to plaintiffs' constitutional

20  challenge to this statutory scheme and whether the Court should apply that level of scrutiny only

21  to the Social Security survivor benefit scheme or to the underlying state statute that banned

---

23       [5] The issue of jurisdiction over the class action and mandamus claims and the standing of
the National Committee to bring those claims is discussed further, *infra*.

1    same-sex marriage—or to both.  *See* Dkt. 53, at 21; Dkt. 63, at 19.  In this court's opinion, the

2    statutes should be read together, and regardless of the level of scrutiny applied, conditioning

3    federal benefits on unconstitutional state laws runs afoul of the Supreme Court's precedent

4    interpreting the Fifth and Fourteenth Amendments.

5           In *Windsor*, the Court was evaluating the enforceability of a federal statute, where

6    Congress's purpose was to discriminate against same-sex marriage that was legalized by the

7    state.  *See* 570 U.S. at 769–70.  The Court invalidated the federal law that refused to recognize

8    same-sex marriages that were lawful under state law.  *Id.*  In *Obergefell,* the Court was

9    evaluating the enforceability of state statutes, where the states' purpose was to discriminate

10   against same-sex marriage that was prohibited in those states.  *See* 135 S. Ct. at 2604–05.  The

11   Court invalidated those state laws.  *Id.*  In both cases, the Court concluded that same-sex

12   couples' right to marry was protected under the due process and equal protection clauses.  *Id.* at

13   2604; *Windsor*, 570 U.S. at 774–75.

14          The Supreme Court consistently has held that the same or similar analysis applies to both

15   the due process clause of the Fifth Amendment (applied to federal statutes) and the due process

16   and equal protection clauses of the Fourteenth Amendment (applied to state statutes).  *See*

17   *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Adarand Constructors, Inc. v. Pena*, 515 U.S.

18   200, 217–18 (1995).  As noted in *Windsor*, "the equal protection guarantee of the Fourteenth

19   Amendment makes that Fifth Amendment right [to due process] all the more specific and all the

20   better understood and preserved."  570 U.S. at 774.  Therefore, the interplay of federal statutes

21   and state statutes calls into question the same principles of due process and equal protection of

22   the laws.

23

24

1    In this case, since the federal statute providing survivor's benefits conditions benefits on

2    a state's law defining marriage, both must be read together when evaluating Ms. Windsor's

3    constitutional rights.  Indeed, they are inseparable—the Administration cannot determine a

4    claimant's eligibility for survivor's benefits without looking to state law.  *See* 20 C.F.R.§

5    404.345 ("To decide your relationship as the insured's widow or widower, we look to the laws of

6    the State where the insured had a permanent home when he or she died.").  Therefore,

7    considering the constitutionality of the entire statutory scheme necessarily includes considering

8    both the federal scheme and the underlying state statutes upon which it relies.

9    Regarding the level of scrutiny to be applied, although Ninth Circuit cases prior to

10   *Obergefell* referred to the "rational basis" test (*see, e.g.*, *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir.

11   2011)) or the "heightened scrutiny" test (*see, e.g.*, *SmithKline Beecham Corp. v. Abbott Labs.*,

12   740 F.3d 471, 489 (9th Cir. 2014); *Latta*, 771 F.3d at 465), the Court in *Obergefell* did not refer

13   to those levels of scrutiny and simply concluded that the right to marry is a "fundamental right"

14   and that same-sex couples may not be deprived of that right.  135 S. Ct. 2598.  Although prior

15   cases, and the Administration, discuss which standard to apply based on whether the statute was

16   "facially neutral" or whether the statute reflected discriminatory "intent" (*see, e.g.*, *Pers. Adm'r*

17   *of Mass. v. Feeney*, 442 U.S. 256, 273–76 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev.*

18   *Corp.*, 429 U.S. 252, 264–65 (1977); Dkt. 63, at 20–22), *Obergefell* did not attempt to categorize

19   statutes in the same way.

20   Instead, Justice Kennedy, writing for the majority, noted that interpreting the

21   Constitution,

22           has not been reduced to any formula. . . .  Rather, it requires courts to exercise
23           reasoned judgment in identifying interests of the person so fundamental that the
             State must accord them its respect. . . .  That process is guided by . . . broad
             principles rather than specific requirements.  History and tradition guide and
24

1        discipline this inquiry but do not set its outer boundaries. . . . That method respects our history and learns from it without allowing the past alone to rule the present.

2    *Obergefell*, 135 S. Ct. at 2598 (citations omitted). And the Supreme Court in a later case, again

3    without reciting a formula or enunciating which level of scrutiny applied—if either, reiterated its

4    admonition that same-sex couples were entitled to same "constellation of benefits" conferred on

5    opposite sex couples. *See Pavan v. Smith*, ___ U.S. ___, 137 S. Ct. 2075, 2078 (2017) (internal

6    quotation marks and citation omitted).

7         The Court also recognized that we should be vigilant to eliminate the remaining vestiges

8    of discrimination that may linger after the formal recognition of constitutional rights, such as the

9    right to marry.

10         The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth

11         Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all

12         persons to enjoy liberty as we learn its meaning. When new insights reveals discord between the Constitution's central protections and a received legal stricture, a claim

13         to liberty must be addressed.

14    *Obergefell*, 135 S. Ct. at 2598.

15         Inextricable from the Court's discussion of the importance of marriage is the

16    "constellation of benefits that the States have linked to marriage." *Id.* at 2601. The Court then

17    states that "[t]his harm results in more than just material burdens." *Id.* Thus it is clear that, in

18    declaring same-sex marriage a fundamental right, the Court intended to cure material burdens

19    withheld from same-sex couples, as well as dignitary ones.

20         Cognizant of the Supreme Court's most recent rulings, and using its language, this court

21    has evaluated whether the present denial of federal survivor benefits based on Washington state's

22    past denial of Ms. Thornton's fundamental right to same-sex marriage "inflict[s] substantial and

23

24

1    continuing harm on same-sex couples" in violation of the Fifth and Fourteenth Amendments.

2    *See id.* at 2607.

3                              **2.  Substantial and Continuing Harm**

4            The case before the court clearly demonstrates such substantial and continuing harm.

5    Since the Social Security statutes define an applicant's relationship with the insured based on the

6    laws of the state where they resided at the time of the insured's death, the federal statutes are

7    inextricably tied to the state statute that defined their relationship.  *See* 42 U.S.C. § 416(c)(1),

8    (g)(1), (h)(1)(A).  Because Ms. Brown was legally prohibited by the State of Washington from

9    marrying Ms. Thornton, denying Ms. Thornton survivor's benefits inflicts on her a "substantial

10   and continuing harm" arising from the unconstitutional denial of her fundamental right to marry.

11           The Administration argues that Ms. Thornton was not denied benefits because she had a

12   same-sex partner but because she had not been married to her partner prior to Ms. Brown's

13   death.  *See* Dkt. 63, at 10–11.  But this argument sidesteps the obvious—it was a state law of

14   precisely the type declared unconstitutional by *Obergefell* that denied Ms. Thornton the right and

15   the opportunity of marrying Ms. Brown.  Granted, the Administration no longer interprets the

16   federal statute to exclude same-sex marriage.  But the Administration has not re-interpreted the

17   federal statute's reliance on unconstitutional state laws prohibiting same-sex marriage to comply

18   with *Obergefell*.  Rather it remains part of the "a long history of disapproval of their

19   relationships" to deny same-sex couples the same rights as opposite sex couples.  *Obergefell*, 135

20   S. Ct. at 2604.  The Administration failed to account for this impact on surviving same-sex

21   partners after *Obergefell*, in the same way that it accounted for the Court's ruling protecting

22   same-sex marriage after *Windsor*.  Its failure to address this "substantial and continuing harm"

23   requires the court to address it now.

24

1    Ms. Thornton's constitutional rights have been impacted in three ways.  First, her

2  fundamental right to marry the person of her choice impacted her rights under the due process

3  clauses of the Fifth and Fourteenth Amendment.  *See Obergefell*, 135 S. Ct. at 2604.  Second,

4  because she could have married Ms. Brown if she had been a man, she was discriminated against

5  because she was a woman.  *See Latta*, 771 F.3d at 479–80 (Berzon, J., concurring).  Finally, the

6  bar against same-sex marriage was part of a "long history" of discrimination against same-sex

7  couples.  *See Obergefell*, 135 S. Ct. at 2594.  Therefore, she was also discriminated against

8  because of her sexual orientation.  *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *Latta*, 771

9  F.3d at 467; *Diaz*, 656 F.3d at 1014; *In re Fonberg*, 736 F.3d 901, 903 (9th Cir. Jud. Council

10  2013).  Whether considered separately or together, the impacts on Ms. Thornton's constitutional

11  rights are substantial.

12    The Administration asserts that it was not the Administration, but the state that

13  discriminated—and that the federal statute at issue is not subject to the constitutional infirmities

14  of the state law upon which it relies.  The parties have not cited to, and this Court has not found,

15  any Ninth Circuit case addressing whether a federal statute denying survivor's benefits based on

16  an unconstitutional state statute is also unconstitutional.  For guidance, the Court finds

17  persuasive the decision in *Cox v. Schweiker,* 684 F.2d 310 (5th Cir. 1982), which considered an

18  analogous circumstance.

19    In that case, the Administration denied survivor's benefits to the child of a deceased

20  father based on a Georgia state statute that did not recognize equal intestate rights of a child born

21  outside of wedlock.  *Id.* at 312.  Although Georgia law was subsequently changed to remove this

22  barrier, at the time of the father's death, the applicant child did not qualify to recover benefits

23  because of those barriers.  *Id.* at 314–15.  Therefore, although the Social Security survivor statute

24

1    was facially neutral, the court found that the Administration was denying survivor's benefits

2    based on a state statute that was substantially similar to other state statutes that had been found to

3    be unconstitutional by the Supreme Court in *Trimble v. Gordon*, 430 U.S. 762 (1977) and *Lalli v.*

4    *Lalli*, 439 U.S. 259 (1978). *Cox,* 684 F.2d at 320.

> We are convinced that the structure and language of 42 U.S.C.[] § 416(h)(2)(A) of
> the Social Security Act, referring to state law on intestate inheritance, makes
> relevant the issue of the constitutionality of a particular state law. . . .  When a
> [state] statute conferring benefits on a certain class of persons is held
> unconstitutional due to a violation of the equal protection clause, then the unlawful
> discrimination or classification must be eradicated, either by granting the benefits
> to the inappropriately excluded class, or by denying them to the class theretofore
> benefitted unlawfully.  *Welsh v. United States*, 398 U.S. 333, 361 . . . (1970).  In
> such cases . . . , the normal judicial remedy is to extend the benefits to the deprived
> group.  *See Califano v. Westcott,* 443 U.S. 76 . . . (1979) (citing numerous other
> cases involving federal benefits statutes).

11    *Id.* at 317.

12    Indeed, when other courts have reviewed cases where the benefits of marriage have been

13    wrongfully denied, they have consistently allowed the deprived person the opportunity of the full

14    benefits that had been taken from them.  *See, e.g.*, *Trimble*, 430 U.S. at 768–76 (denial of Social

15    Security survivor benefits to children born out of wedlock under state law)*; Weinberger v.*

16    *Wiesenfeld*, 420 U.S. 636 (1975) (denial of Social Security survivor benefits to a widower, when

17    the same benefits would be extended to a widow); *Diaz*, 656 F.3d at 1014 (denial of spousal

18    health insurance benefits to same-sex partners who could not marry under state law); *cf. Loving*

19    *v. Virginia*, 388 U.S. 1 (1967) (vacating convictions under state law banning interracial

20    marriages).

21    The same principle should be applied here.  Although the Social Security statute is

22    facially neutral, it relies on state statutes that have been rendered unconstitutional by the

23    Supreme Court.  The Social Security statute incorporating the unconstitutional state statute

24

REPORT AND RECOMMENDATION - 14

1   should not be enforced in a way that continues to deprive a class of people of their constitutional

2   rights. "To hold otherwise would in effect amount to a retroactive interference with vested

3   rights. . . ." *Cox*, 684 F.2d at 318. Because Ms. Thornton can demonstrate that but for the

4   unconstitutional barrier to same-sex marriage, she would have been a "Widow," as that term is

5   otherwise defined, she should be able to recover the same benefits as other persons similarly

6   situated.

7          This is not a case that seeks to re-do history. Although Ms. Thornton and Ms. Brown

8   were denied the right to marry prior to Ms. Brown's death, there was no injury to Ms. Thornton

9   until after her claim was adjudicated by the ALJ. Ms. Thornton suffers a substantial and

10  continuing harm every month that she is denied her monthly survivor benefit. Therefore, even

11  though Ms. Brown did not live long enough to see the fulfillment of her efforts towards marriage

12  equality, Ms. Thornton did. Granting her benefits would alleviate this "substantial and

13  continuing harm."

14                         **3. The Administration's Arguments**

15         The Administration argues that the subject regulation is simply administrative line-

16  drawing and that in the absence of any evidence of improper purpose to discriminate, the statute

17  should be enforced even if it has a disparate impact on a class of persons who have suffered from

18  discrimination in the past. *See* Dkt. 63, at 21–22. The Administration relies on *Feeney*, 442 U.S.

19  256. In *Feeney*, the Supreme Court upheld a state statute that gave hiring preference to

20  "veterans" even though it had a disparate impact on women. *Id.* at 281. The Court found that

21  over 98% of those persons who benefited from this preference were men. *Id.* at 270. Although

22  the Supreme Court acknowledged that this statute had a disparate impact on women, it held that

23  "the history of discrimination against women in the military is not on trial in this case." *Id.* at

24

1   278.  Using a "rational basis" test, the Court ruled that the Fourteenth Amendment cannot be

2   used for all "ill-advised laws" and upheld the statute.  *Id.* at 281.

3        As noted earlier, this "rational basis" analysis has evolved since this 1979 ruling and may

4   not be applied the same today.  Even so, Ms. Thornton's case is different than *Feeney* in several

5   respects.  First, in *Feeney,* the Court determined that the state legislature did not enact the statute

6   with the "collateral goal of keeping women in a stereotypic and predefined place in the

7   Massachusetts Civil Service."  *Id.* at 279.  The Court held that the statute was adopted to favor

8   veterans—and not for the purpose of discriminating against women.  *Id.* at 275.  And, indeed, at

9   least some—although a paltry few—women benefited from the hiring preference.  *Id.* at 276–77.

10       In Ms. Thornton's case, however, Washington State's ban on same-sex marriage, by

11  definition, excluded an entire class of same-sex couples—she was not just restricted, but rather

12  barred from marrying Ms. Brown.  In Ms. Thornton's case, as in *Obergefell*, state laws

13  prohibiting same-sex marriage were part of "a long history of disapproval of their relationships,"

14  and "this denial to same-sex couples of the right to marry works a grave and continuing harm."

15  *Obergefell,* 135 S. Ct. at 2604.  Therefore, even if the same "rational basis" standard used in

16  *Feeney* were to be applied here, it would not be controlling of the outcome.

17       Moreover, the Ninth Circuit applied the rational basis test for denying same-sex couples

18  state-sponsored healthcare benefits in *Diaz* and found that state laws prohibiting same sex

19  domestic partners from receiving state sponsored healthcare did not further a legitimate state

20  interest because they were based on a desire to harm a politically unpopular group.  *Diaz*, 656

21  F.3d at 1014–15.

22

23

24

1    Even if the "rational basis" test applies, which is questionable, none of the reasons

2  provided by the Administration can provide a rational basis for denying Ms. Thornton survivor's

3  benefits.

4                    *a.  Fraudulent Marriages*

5    The Administration argues that the marriage requirement reduces the risk of fraudulent

6  requests for benefits and that it should be able to impose reasonable limitations on persons

7  recovering benefits even though it inevitably requires denying benefits to some persons who may

8  otherwise be deserving.  *See* Dkt. 63, at 23–26 (citing *Weinberger v. Salfi*, 422 U.S. 749 (1975)).

9    In *Salfi*, the Court was considering the "duration-of-relationship" requirement in the same

10  survivor's benefits statute at issue in this case.  *Id.* at 754.  Ms. Salfi and her husband had only

11  been married less than a month when he died suddenly.  *Id.*  She applied for benefits arguing that

12  the nine-month limitation should not be applied to her.  *Id.*  The Court disagreed.  It concluded

13  that even when there is an "inherent imprecision" in the defining statute, "a noncontractual claim

14  to receive funds from the public treasury enjoys no constitutionally protected status[.]"  *Id.* at

15  773.  Since there was no evidence of invidious discrimination against the claimant, the statute

16  was upheld.  *Id.* at 772.  Ms. Thornton, however, had been subjected to invidious discrimination

17  by the state.  Unlike Ms. Salfi, who chose not to marry her husband until shortly before his death,

18  Ms. Thornton was denied the choice to marry Ms. Brown at all.

19    Perhaps administrative line-drawing may be used as a valid reason to deny benefits to

20  couples who had the legal right to marry, but it could not justify the deprivation of survivor's

21  benefits to same-sex couples who were denied the right to marry.  Therefore, barring Ms.

22  Thornton from recovering the same benefits that would be granted to other persons who enjoyed

23  the benefits of marriage cannot be justified on this basis.

24

1

*b. Administrative Efficiency*

2    Second, the Administration argues that "administrative efficiency" justifies the nine-

3    month marriage requirement, again citing *Salfi*.  Dkt. 63, at 23.  In *Salfi*, the statute's purpose

4    was to avoid the "administrative difficulties of individual eligibility determinations."  422 U.S. at

5    784.  Ms. Thornton's constitutional rights outweigh any alleged administrative burden.  *See*

6    *SmithKline*, 740 F.3d at 482.  "'[T]he Constitution recognizes higher values than speed and

7    efficiency.'"  *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (citing *Stanley v. Illinois*, 405

8    U.S. 645, 656 (1972)).

9    Moreover, the Administration is clearly capable of making these case-by-case

10   determinations and does so in every claim it processes.  It already has regulations in place to

11   make individualized determinations regarding benefits for people in common-law marriages.

12   *See* 20 C.F.R. § 404.726.  Indeed, the Administration is equipped with myriad internal policies

13   for making the exact factual determinations required to determine whether Ms. Thornton and

14   others similarly situated would have married their partner but for the unconstitutional state law.

15   It recognizes exceptions to the nine-month marriage requirement under certain circumstances

16   when the claimant had "a good faith belief" that the marriage was valid, but the wedding

17   ceremony was flawed for some technical reason.  *See* 42 U.S.C. § 416(h)(1)(B)(i).  It also waives

18   the nine-month marriage requirement when state law prevented a claimant from marrying the

19   insured deceased spouse sooner because of a former spouse's institutionalization.  *See* 42 U.S.C.

20   § 416(c)(2), (g)(2).

21   In that instance, the Administration makes a factual determination to determine if the

22   applicant "would have . . . married" at least nine months before but could not do so "because

23   such [marriage] would have been unlawful  . . . under the laws of the State[.]"  *See* 42 U.S.C. §

24

1    416(g)(2).  It also deems the nine-month requirement satisfied, under certain circumstances, if

2    the wage earner dies within that period of time and the death is either accidental or occurs when

3    the wage earner is on active duty and death occurs in the line of duty.  *See* 42 U.S.C § 416(k).

4    Interestingly, the Administration also *denies or reduces* benefits to certain same-sex couples who

5    otherwise would have been married under state law.  "[W]e recognize same-sex couples as

6    married in all states for purposes of determining eligibility or payment amount for SSI, *including*

7    *some same-sex couples we earlier determined were unmarried*."  POMS GN 00210.800

8    (emphasis added).[6]

9       Contrary to the Administration's argument that this would result in "a morass of

10   individual determinations about the nature of particular relationships" (Dkt. 63, at 26), nothing

11   systemically prevents the Administration from making individual determinations.  If anything,

12   the administrative process has demonstrated that it is fully capable of making similar

13   determinations and already does so regularly.

14                          *c.  Financial Interdependence*

15      Third, the Administration argues that the statute should be upheld because it is rationally

16   related to awarding benefits only to those who are most likely to have been in a financially

17   interdependent relationship with the deceased wage-earner.  Dkt. 63, at 23.  Aside from the fact

18   that no Supreme Court decision has yet upheld this reason as a rational basis for denying

19   constitutional rights (*see* Dkt. 63 at 27), it certainly does not apply here.  If anything, the

20   opposite applies.  There is no reason to believe that same-sex couples rely any less on their

21   partners for financial support than opposite sex couples.  And denying same-sex couples the

22   same benefits because they could not lawfully marry deprives them of the contributions that they

23

24            [6] https://secure.ssa.gov/poms.nsf/lnx/0200210800.

1   have paid from their earnings over the years, "in order to contribute to the fund out of which

2   benefits would be paid to others."  *Weinberger*, 420 U.S. at 645 (striking down provisions of

3   Social Security Act discriminating based on sex).  This is exactly the type of harm that was

4   recognized by the Supreme Court in *Windsor,* when the Court noted that denying survivor

5   benefits to same-sex couples who were lawfully married "denies or reduces benefits allowed to

6   families upon the loss of a spouse and parent, benefits that are an integral part of family

7   security." 570 U.S. at 773 (quotation marks and internal citation omitted).  If such a rationale

8   could not be used to deny benefits to same-sex couples who were lawfully married, surely it

9   could not be used as a reason to deny benefits to same-sex couples who could *not* lawfully

10  marry.

11          For the above reasons, the undersigned finds that denying Ms. Thornton's application for

12  survivor benefits based on an unconstitutional state law violates her due process and equal

13  protection rights under the Fifth and Fourteenth Amendments.

14  **III.  RECOMMENDATION ON MOTION FOR CLASS CERTIFICATION**

15          **A.  Overview**

16          Ms. Thornton is also seeking to represent a class of persons similarly situated pursuant to

17  Fed. R. Civ. P. 23(a) and (b)(2).  Dkt. 46, at 6.  Specifically, Ms. Thornton seeks certification

18  under Fed. R. Civ. P. 23(b)(2), which states that a class may be certified where "final injunctive

19  relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Dkt.

20  54, at 34.  Ms. Thornton is a member of the National Committee to Preserve Social Security and

21  Medicare ("National Committee").  Dkt. 46, at 6.  The National Committee alleges that it has

22  "over two million members and supporters nationwide" and "is committed to ensuring that social

23

24

1    security benefits are widely accessible, including to same-sex spouses." Dkt. 46, at 5. It has not

2    sought to be named as a class representative.

3         The Administration opposes class certification, stating that relief should be granted, if at

4    all, only on Ms. Thornton's claim. Dkt. 63, at 38.

5         Because this statutory scheme is applied nationwide, this court agrees that the class

6    should include all persons nationwide. But plaintiffs' proposed class is overbroad because

7    jurisdiction is limited to only those persons who have presented their claim to the

8    Administration. And, the Administration—not the court—should be principally responsible for

9    addressing how the law applies in each case. Finally, in order to avoid interfering with litigation

10   in another district that potentially involves similar, but not identical issues, the class definition

11   should specifically exclude those putative class members. Therefore, as discussed *infra*, this

12   court recommends that the class be defined in relation to the constitutional issue presented and

13   should include,

14       All persons nationwide who presented claims for social security survivor's
         benefits based on the work history of their same-sex partner and who were barred
15       from satisfying the marriage requirements for such benefits because of applicable
         laws that prohibited same-sex marriage. This class is intended to exclude any
16       putative class members in *Ely v. Saul*, No. 4:18-cv-00557-BPV (D. Ariz.)

17       The undersigned recommends certification of this class under Rule 23(b)(2) and, based

18   on finding that the statutory scheme at issue is unconstitutional as discussed *supra*, Part II, the

19   court should issue injunctive relief prohibiting the Administration from denying claims by class

20   members on the basis of the unconstitutional statutory scheme.

21       **B. Jurisdiction**

22       "Section 405(g) specifies the following requirements for judicial review: (1) a final

23   decision of the Secretary made after a hearing; (2) commencement of a civil action within 60

24

1  days after the mailing of notice of such decision (or within such further time as the Secretary

2  may allow); and (3) filing of the action in an appropriate district court[.]" *Salfi*, 422 U.S. at 763–

3  64. The second and third—but not the first—requirement may be waived. *Id.* at 764. The first

4  requirement is not waivable because it is "central to the requisite grant of subject-matter

5  jurisdiction[.]" *Id.*

6       A class action may be brought under § 405(g) challenging the constitutionality of a

7  statutory scheme used to determine eligibility for benefits. *See id.* at 753 (involving a class

8  action challenging the nine-month-duration marriage requirement in the definition of "widow"

9  and "child" in 42 U.S.C. § 416); *see also Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979).

10  Although here, the Administration argues that a class action is not an allowable form of relief, in

11  *Yamasaki*, the Supreme Court rejected this argument and held that "class relief is appropriate" in

12  cases under § 405(g). 442 U.S. at 700. The Court explained—

13      class relief is consistent with the need for case-by-case adjudication emphasized by
   the Secretary, at least so long as the membership of the class is limited to those who

14  meet the requirements of § [4]05(g). . . . Where the district court has jurisdiction
   over the claim of each individual member of the class, Rule 23 provides a procedure

15  by which the court may exercise that jurisdiction over the various individual claims
   in a single proceeding.

16  *Id.* at 701 (internal citation omitted).

17       Indeed, a class action is "peculiarly appropriate" where—as here—a single question of

18  law applies to each member of the class nationwide. *Id.* Such a class action may seek injunctive

19  relief—"[i]njunctions can play an essential role in § [4]05(g) litigation." *Id.* at 705.

20       As will be discussed *infra,* the court does not have § 405(g) jurisdiction over class

21  members who have not presented their claims to the Administration. *See Salfi*, 422 U.S. at 764.

22  The undersigned addresses these issues more fully in the discussion of the class definition. *See*

23  *infra*, part(III)(C).

24

REPORT AND RECOMMENDATION - 22

1          **C.  Class Definition**

2          As noted above, Ms. Thornton, as class representative, has moved for class certification.

3   Dkt. 53, at 34.  She proposes that the class be identified as—

4          [a]ll persons nationwide who (i) presented or will present claims for Social Security
           survivor's benefits based on the work history of a same-sex partner; (ii) were denied
5          or will be denied Social Security spousal survivor's benefits based on not satisfying
           the marriage requirements of the Social Security Act; and (iii) were barred from
6          marrying and otherwise satisfying such requirements because of unconstitutional
           laws prohibiting same-sex couples from marriage prior to their partner's death.
7   Dkt. 53, at 35.

8          The class definition proposed by plaintiffs requires modification to account for several

9   issues raised by the Administration.

10          **1.  Presentment**

11          Plaintiffs' proposed class definition runs afoul of the jurisdictional limitation that class

12   members have presented claims, as it includes people who have not yet presented their claims to

13   the Administration for benefits.  *See* Dkt. 53, at 35 (including putative class members who have

14   "presented *or will present* claims" (Emphasis added.)).  The Administration asserts that this court

15   lacks jurisdiction over unnamed plaintiffs who have not presented their claims to the

16   Administration.  Dkt. 63, at 39.  The undersigned agrees.

17          Section 405(g) grants federal court jurisdiction only where claims have been properly

18   presented before the agency and where a final agency decision has been issued.  *See Salfi*, 422

19   U.S. at 763–64.

20          The Supreme Court recently reaffirmed prior holdings that presenting a claim to the

21   Administration is a jurisdictional requirement for judicial review.  *Smith v. Berryhill,* 139 S. Ct.

22   1765, 1773 (2019) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 328 (1976)).  This is not

23   waivable.  In *Salfi*, the Court examined whether unnamed plaintiffs in a class action who had not

24

1    presented their claim to the Administration could proceed—the Court held that they could not.

2    422 U.S. at 763 ("We conclude that [§ 405(g)] provided jurisdiction only as to the named

3    appellees and not as to the unnamed members of the class."); *see also id.* at 758, n. 6 ("The

4    entitlement sections of the Act specify the filing of an application as a prerequisite to entitlement,

5    so a court could not in any event award benefits absent an application."); *accord Grijalva v.*

6    *Shalala*, No. 93-711 TUC ACM, 1995 WL 523609, at *6 (D. Ariz. July 18, 1995) (in defining a

7    class of claimants for Medicare benefits, ruling that "other individuals who have not filed claims

8    for benefits with the Secretary, such as future claimants of Medicare benefits, cannot satisfy the

9    non-waivable presentment requirement of § 405(g).").

10          Although plaintiffs cite cases that suggest otherwise, those cases are not controlling in

11   this district or do not involve § 405(g)'s presentment requirement.  *See* Dkt. 64, at 25.  Therefore,

12   the undersigned recommends certification of a class including only those who have presented

13   claims to the Administration.

### 2. Exhaustion

15          Generally, persons applying for benefits are required to exhaust the administrative

16   process before applying to the court for relief.  *See Smith*, 139 S. Ct. at 1773–74; *Salfi*, 422 U.S.

17   at 766.  Unlike the presentment requirement, the exhaustion requirement may either be waived

18   by the Administration or excused by the court.  *See Smith,* 139 S. Ct. at 1773–74.

19          The Administration has not waived exhaustion with respect to the claims in this case.  *See*

20   Dkt. 49, at 13–14.  The Administration claims that the court should not excuse exhaustion

21   because this is a fact-specific inquiry for each claimant and cannot be resolved *en masse*.  Dkt.

22   63, at 40.

23

24

1        Plaintiffs argue that the Court should excuse the exhaustion requirement in this matter

2    because exhausting the administrative claims process would have been futile.  Dkt. 53, at 37.

3        The undersigned agrees with plaintiffs but modifies the proposed class definition to make

4    it clear that the Administration—and not the court—will be tasked with implementing

5    appropriate regulations to comply with this court's proposed injunction.

6        Waiver is appropriate where the action is "collateral to a substantive claim of

7    entitlement," the economic hardship suffered by plaintiffs while awaiting exhaustion constitutes

8    irreparable injury, and there is no advantage to compiling an administrative record.  *See Johnson*,

9    2 F.3d at 921–23.  Citing the Supreme Court decision in *Bowen v. New York*, 476 U.S. 467

10   (1986), district courts have held that exhaustion requirements may be waived where exhaustion

11   would be futile.  *See also Salfi*, 422 U.S. at 767.  Where there is no dispute regarding the facts or

12   application of statutory law, and the only issue is the constitutionality of a statutory requirement,

13   waiver of exhaustion is particularly appropriate.  *See Salfi*, 422 U.S. at 766–67.

14        While each case may present unique questions regarding whether or not any particular

15   claimant would have been married to his or her deceased partner but for their state's law

16   prohibiting such a marriage, answering those unique questions is not determinative of the

17   constitutional issue presented to this court.  Because the Administration does not even consider

18   claims for persons who were not married, requiring claimants to exhaust the administrative

19   remedies would be futile.  As noted above, although the Administration is uniquely qualified to

20   make these factual, case-by-case determinations, it has chosen not to do so because of its policy

21   not to consider such claims.  It is not hard to imagine that a person who files a claim and is

22   informed that the claim was denied because of the Administration's policy prohibiting such

23   claims would simply choose to give up rather than exhaust the administrative process.  That is

24

1   the definition of "futile."  Because this challenge to the policy "rises and falls on its own,

2   separate from the merits of their claim for benefits," putative class members should not be

3   excluded simply because they failed to exhaust their administrative remedies.  *See Johnson,* 2

4   F.3d 921–22 (internal quotation marks and citation omitted); *see also Mathews*, 424 U.S. at 330–

5   31 (finding that a constitutional challenge is collateral to the substantive claim of entitlement;

6   therefore, waiving exhaustion is proper.)

7         Therefore, the undersigned recommends certifying a class that would include even those

8   who have not yet exhausted their claims.

### 3.  60-Day Statute of Limitations

10         The Administration also argues that the purported class should not include those who

11  received a final agency decision but did not bring suit in federal court within 60 days, as required

12  by 42 U.S.C. § 405(g).  Although the Administration has not waived this defense (*see* Dkt. 49, at

13  13), it concedes that this is not jurisdictional and that the court may excuse it.  Dkt. 63, at 41

14  (citing *Vernon v. Heckler,* 811 F.2d 1274, 1278 (9th Cir. 1987)).

15         In *Bowen*, the Supreme Court held that while the Administration will usually determine

16  whether or not to extend the 60-day limitation on filing a district court appeal after exhaustion of

17  administrative remedies, "cases may arise where the equities in favor of tolling the limitations

18  period are so great that deference to the agency's judgment is inappropriate."  476 U.S. at 480

19  (internal quotation marks and citation omitted).

20          Here, the equities favor waiving the 60-day filing requirement for those persons who

21  filed claims.  Since the undersigned is recommending that persons be excused from exhausting

22  their administrative remedies, and exhaustion is usually a requirement before filing a court

1  action, it stands to reason that the requirement to file a federal action within 60 days of the

2  agency's final decision should be waived as well.

3      Therefore, the undersigned recommends certifying a class that includes those who have

4  not filed a federal action within 60 days of a final agency decision.

### 4.    "Applicable law."

6      In their supplemental briefing regarding numerosity, the parties also addressed the

7  Court's proposal to limit the class to claimants unable to obtain survivor's benefits due to "their

8  state's laws prohibiting same-sex marriage." Dkt. 69, at 1. Plaintiffs objected to this language

9  on the basis that it would not include same-sex couples who lived in jurisdictions such as Puerto

10  Rico or the District of Columbia. *See* Dkt. 71, at 9. The Administration countered that "their

11  state" was an appropriate limitation as the regulations track similar language. *See* Dkt. 73, at 8.

12      The legal question presented is whether *any* law banning same-sex marriage impacted a

13  claimant's right to recover benefits. The constitutional question is not limited to any particular

14  state's borders. It is intended to include the District of Columbia, Puerto Rico, and any other

15  jurisdiction that previously banned same-sex marriage. Therefore, the undersigned recommends

16  that the class definition more broadly include any person who was denied benefits based on

17  "applicable law" that banned same-sex marriage.

### D. Rule 23(a) Prerequisites

19      Having determined the appropriate class definition, the undersigned turns to whether

20  plaintiffs have shown that the proposed class satisfies Rule 23(a)'s prerequisites to maintain a

21  class action.

22      Under Rule 23(a), one or more class members may represent the class so long as "(1) the

23  class is so numerous that joinder of all members is impracticable; (2) there are questions of law

or fact common to the class; (3) the claims or defenses of the representative parties are typical of

the claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class.  Fed. R. Civ. P. 23(a)(1)–(4).  The court has an independent duty

to conduct a meaningful inquiry into the requisites of Rule 23(a).  *Int'l Woodworkers of Am. v.*

*Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981).  Class certification is

proper "only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule

23(a) have been satisfied[.]'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)

(quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

### 1. Numerosity

A class representative may be sued on behalf of all members where "the class is so

numerous that joinder of all members is impracticable."  Fed. R. Civ. P. Rule 23(a)(1).  Although

the parties did not dispute that the proposed class is sufficiently numerous (*see* Dkt. 63, at 42–

26), the undersigned requested additional briefing on this issue to satisfy the court's duty to

conduct a meaningful inquiry into whether the Rule 23(a) prerequisites were satisfied.  *See* Dkt.

69.

Plaintiff posited that "there are at least several dozen individuals throughout the country

who are still living today whose loved ones died before marriage was available to them in their

state." Dkt. 53, at 41.  In response to the Court's request for supplemental briefing, plaintiff

asserts that even limiting the proposed class to only those who have already presented claims

results in a sufficiently numerous class since joinder of persons throughout the country is

impracticable and class members by definition have limited financial resources to press their

own claims.  *See* Dkt. 71, at 4–8.  Moreover, plaintiff asserts that "[g]iven the thousands of

same-sex couples who were barred from marriage over time, and the reality that some

1    individuals within that group died before marriage was available thus leaving a surviving partner,

2    only a small fraction would need to have presented claims to make joinder impracticable." Dkt.

3    71, at 7–8. Plaintiff relies on evidence that at least 22 people have inquired about benefits for

4    surviving same-sex partners since 2013 and have appeared likely to fall within the class

5    definition—representing only a small minority of those actually included. *See* Dkt. 71, at 8.

6         "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or

7    more members and will find that it has not been satisfied when the class comprises 21 or fewer."

8    *Celano v. Marriott Int'l*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). The court may infer that the

9    numerosity requirement is met by "general knowledge" and "common sense." *See Nw.*

10   *Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, 325 F.R.D. 669, 679 (W.D.

11   Wash. 2018). "[T]he numerosity requirement is relaxed for classes seeking injunctive relief."

12   *Skaar v. Wilkie*, __ Vet. App. __, 2019 WL 6647587, at *21 (Dec. 6, 2019) (citing *Sueoka v.*

13   *United States*, 101 F. App'x 649, 653 (9th Cir. 2004)). When injunctive relief is the only relief

14   requested, even speculative or conclusory representations regarding numerosity will suffice to

15   permit class certification. *Horn v. Ass'n Wholesale Grocers, Inc.*, 555 F.2d 270, 275–76 (10th

16   Cir. 1977).

17        The Administration asserts that plaintiffs' evidence about "22 phone records of callers"

18   inquiring about survivors' benefits is inadequate because it is hearsay and does not specify

19   individuals who presented their claims. *See* Dkt. 73, at 5–6. To the extent that the

20   Administration raises hearsay objections, the Court denies them—"[i]n determining whether

21   class certification is appropriate under Rule 23, courts may consider all material evidence

22   submitted by the parties . . . and need not consider the ultimate admissibility of evidence

23

24

1  proffered by the parties." *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 627 (S.D. Cal. 2015) (internal

2  quotation marks and citation omitted).

3      Here, relying on common sense and the more relaxed numerosity standard when

4  addressing the proposed injunctive relief, the undersigned concludes that plaintiffs have satisfied

5  this requirement.  As a practical matter, it is impossible to know how many claimants nationwide

6  were impacted by the Administration's blanket refusal to award benefits to the defined class.

7  And, although this information may be exclusively within the records of the Administration, it

8  has not chosen to offer up such information.  Nevertheless, considering the widespread and

9  growing population of same-sex marriages in this country, it stands to reason that a significant

10  number of same-sex surviving partners would fall within the purview of the proposed

11  injunction—at least more than 26, and probably more than 40 nationwide.  Therefore, in light of

12  the fact that plaintiff seeks solely injunctive relief, the undersigned finds that plaintiff has

13  adequately satisfied the numerosity prerequisite to bring a class action under 23(b)(2).

## 2. Commonality

14

15      The commonality requirement states that there must be "questions of law or fact common

16  to the class."  Fed. R. Civ. P. Rule 23(a)(2).  The Administration asserts that the commonality

17  requirement is not met because there are too many factual determinations and that plaintiffs'

18  claim is "[m]erely alleging a 'violation of the same provision of law' [which] does not satisfy

19  commonality."  Dkt. 63, at 34 (quoting *B.K. v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019)).

20      Both sides cite *Wal-Mart Stores, Inc.*, for their opposite positions on this issue.  The

21  undersigned agrees that this case is determinative and aligns with plaintiffs' position.  In *Wal-*

22  *Mart*, the Court held that a class action against Wal-Mart because of alleged unequal pay and

23  promotions for women employees was not appropriate under Title VII of the Civil Rights Act.

24

1    564 U.S. at 343.  Fatally, plaintiffs in that case could not point to any single corporate policy

2    against women but rather a "corporate culture" that permitted bias against women.  *Id.* at 345.

3    The Court concluded that there was no "common contention" that could be resolved by a class-

4    wide resolution.  *See id.* at 350.  Each employment decision may or may not have been driven by

5    the alleged discriminatory "corporate culture."  *Id.*  Since plaintiffs were seeking an award of

6    money damages, each determination would require individualized resolution.

7         Here, the common contention is class-wide—can *any* same-sex partner recover survivor

8    benefits when the couple was prevented from marrying by state law?   The Administration's

9    policy against awarding benefits to same-sex survivors in that circumstance is absolute.

10   Although each claimant will have an individual case to be made to support his or her claim for

11   survivor benefits, certifying the class will give each class member the opportunity to make that

12   claim—something they have been unable to do in the past.  Plaintiffs seek an agency-wide

13   injunction.  The *Wal-Mart* decision makes clear that when the issue to be resolved "is central to

14   the validity of each one of the claims in one stroke," a class-wide resolution is appropriate.  *See*

15   *id.* at 350.  Such is the case here.

16        In a case decided in this District, *Moussouris v. Microsoft*, the court denied class

17   certification in a sexual discrimination claim very much like the *Wal-Mart* case.  *See* C15-1483

18   JLR, 2018 WL 3328418, at *26 (W.D. Wash. June 25, 2018), *affirmed*, __ F. App'x __, 2019

19   WL 7176331 (9th Cir. Dec. 24, 2019).  Again, Microsoft's employment practices delegated

20   discretionary employment decisions broadly, and plaintiffs could not identify any single

21   employment practice that presented a common question sufficient to certify a class.  *Id.* at *23.

22   The court noted that without the "glue" that held all of the individual claims of discrimination

23   together, class action was unwarranted.  *Id.*  Here, the "glue" is the immutable position of the

24

1  Administration that a surviving same-sex partner can never recover survivor's benefits even if

2  state law prohibited her from marrying.  Class certification to resolve that common question

3  overrides the individual determinations that the Administration will make in each claimant's

4  case.  Plaintiffs have met that burden here.

### 3.  Typicality

6  The representative party must have "claims or defenses . . . [that] are typical of the

7  claims or defenses of the class."  Fed. R. Civ. P. Rule 23(a)(3).  The Administration argues that

8  Ms. Thornton's claims are not typical of the class because the factual circumstances surrounding

9  her relationship with Ms. Brown may not be typical of other class members.  For example, the

10 Administration argues that some couples may have eventually broken up or remarried.  Dkt. 63,

11 at 42–43.  And the Administration argues that Ms. Thornton and Ms. Brown are the rare

12 exception who would be able to prove unequivocally that but for state law they would have

13 married but that many other same-sex couples would not have similarly compelling stories.  Dkt.

14 63, at 44–45.

15 Plaintiffs counter that these individual questions for each claimant are not before the

16 court but will be investigated at the administrative level when the putative class members present

17 their claims for benefits.  Plaintiffs assert that they are seeking threshold entry for class members

18 who are similarly situated to Ms. Thornton to have their claims reassessed on equal footing with

19 opposite-sex couples when seeking survival benefits.  Dkt. 53, at 44–45.

20 As noted by the Court in *Wal-Mart*, "[t]he commonality and typicality requirements of

21 Rule 23(a) tend to merge."  564 U.S. at 349 n.5 (internal quotation marks and citation omitted).

22 Without repeating the discussion above, suffice it to say that Ms. Thornton's claim is typical of

23 all other putative class members to the extent that they all suffered the same constitutional injury.

24

1    How that plays out in each individual claim will be decided at the administrative level. But they

2    should not be denied the opportunity of making that claim by a blanket refusal to recognize the

3    continuing impact of state laws barred same-sex marriage.

### 4. Adequate Representation

5    The representative party must "fairly and adequately represent the interests of the class."

6    Fed. R. Civ. P. Rule 23(a)(4). "Adequate representation depends on the qualification of counsel

7    for the representatives, an absence of antagonism, a sharing of interest between representatives

8    and absentees, and the unlikelihood that the suit is collusive." *Local Joint Exec. Bd. of Culinary*

9    */Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (internal

10   quotation marks and citations omitted).

11   The Administration does not address this issue in its opposition to class certification other

12   than by repeating its arguments against typicality. *See* Dkt. 63, at 46 n.22. Nor does the

13   Administration challenge plaintiffs' choice of class counsel. *See* Dkt 63. The undersigned has

14   examined the materials submitted by Ms. Thornton and her counsel. Plaintiffs' counsel is

15   competent and experienced in relevant constitutional litigation and class actions and has

16   presented sufficient information to the court to satisfy this requirement. No party has identified

17   any conflicts that would prevent Ms. Thornton or her counsel from adequately representing the

18   class.

### E. Nationwide Injunctive Relief

20   The Administration argues that even if a class action may be certified under § 405(g), the

21   class cannot be nationwide. Dkt. 63, at 47. The Court recommends certifying a class that

22   includes class members outside of Washington State and granting injunctive relief that extends to

23   all class members. Such relief is appropriate in this case for the reasons discussed below.

24

1    In *Yamasaki,* the Court authorized a nationwide class under Rule 23(b)(2), explaining—

2    Nothing in Rule 23, however, limits the geographical scope of a class action
3    that is brought in conformity with that Rule.  Since the class here was certified in
     accordance with Rule 23(b)(2), the limitations on class size associated with Rule
     23(b)(3) actions do not apply directly.  Nor is a nationwide class inconsistent with
4    principles of equity jurisprudence, since *the scope of injunctive relief is dictated by*
     *the extent of the violation established*, not by the geographical extent of the plaintiff
5    class. . . .  If a class action is otherwise proper, and if jurisdiction lies over the claims
     of the members of the class, the fact that the class is nationwide in scope does not
6    necessarily mean that the relief afforded the plaintiffs will be more burdensome
     than necessary to redress the complaining parties.

7    442 U.S. at 702 (emphasis added) (citation omitted); *see also L.A. Haven Hospice, Inc. v.*

8    *Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("Our Supreme Court has cautioned that 'injunctive

9    relief should be no more burdensome to the defendant than necessary to provide complete relief

10   to the plaintiffs' before the court. . . .  *This rule applies with special force when there is no class*

11   *certification*.") (quoting *Yamasaki*, 442 U.S. at 702)).  Therefore, since the denial of survivor

12   benefits at issue in this case is being applied nationally, because class certification is appropriate,

13   and because the Court has jurisdiction over all claims presented by the class members, the

14   undersigned recommends that the class be certified nationally.

15       Recent Ninth Circuit case law dictates that before this court recommends nationwide

16   relief, the court must analyze whether nationwide relief is "'*necessary* to give prevailing parties

17   the relief to which they are entitled.'"  *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030

18   (9th Cir. 2019) (quoting *California v. Azar,* 911 F.3d 558, 582 (9th Cir. 2018)).  Of note, *East*

19   *Bay* did not involve a class action lawsuit, as is the case here.  *See E. Bay Sanctuary Covenant v.*

20   *Barr*, 385 F. Supp. 3d 922, 935 (N.D. Cal. July 24, 2019).  The class action rules are specifically

21   designed to address the question of geographic scope and, therefore, are not of a similar nature as

22   the type of nationwide injunction of concern in *East Bay Sanctuary* and similar cases cited by

23   that court.

24

REPORT AND RECOMMENDATION - 34

1    The court in *East Bay Sanctuary* also points out that nation-wide injunctions are only

2    appropriate in "'exceptional cases'" because they may "'stymie novel legal challenges and robust

3    debate' arising in different judicial districts.'"  934 F.3d at 1029 (quoting *City & Cty. of S.F. v.*

4    *Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).  That does not appear to be the case here.

5    Although the Administration advised the court during oral argument that there are cases in other

6    districts that involve same-sex partner survivor benefits, the Administration also stated that this

7    case is unique in that it involves a claimant whose partner died before state law allowed for

8    same-sex marriage and whose claim was denied after *Obergefell* was decided.  Therefore, it does

9    not appear that this court will be interfering with the decisions of other courts that may be

10   considering similar, but not identical, issues.  Indeed, the Court recommends that the class be re-

11   defined to explicitly exclude members of the *Ely* class action.  *See supra*, part III(A).

12   Finally, the court in *East Bay Sanctuary* cautions that the injunction should be narrowly

13   tailored to remedy the specific harm shown.  934 F.3d at 1029.  The proposed injunction would

14   be narrowly tailored to address only the constitutional issue and not address each individual set

15   of facts that may arise in each claim.  That would be more properly addressed by the

16   Administration during the claims process.  Tellingly, in *Yamasaki*, the Court was reviewing two

17   class action cases interpreting the constitutionality of the same Social Security provision that

18   were consolidated for consideration.  442 U.S. at 690.  One district court limited the class to

19   residents in the State of Hawaii.  *Id.* at 687.  The other district court authorized a nation-wide

20   class.  *See id.* at 689–90.  The Court concluded that the nationwide class was not inappropriate

21   because it "saves the resources of both the courts and the parties by permitting an issue

22   potentially affecting every social security beneficiary to be litigated in an economical fashion

23   under Rule 23."  *Id.* at 701.

24

1    For the foregoing reasons, the court concludes that granting nationwide relief is

2   "*necessary* to give prevailing parties the relief to which they are entitled." *E. Bay Sanctuary*

3   *Covenant*, 934 F.3d at 1030 (internal quotation marks and citation omitted).

### F.  Mandamus Jurisdiction and the National Committee

5    Plaintiffs argue in the alternative that if jurisdiction does not lie under § 405(g) for their

6   claims, then this Court has mandamus jurisdiction under 28 U.S.C. § 1361.  *See* Dkt. 53, at 36–

7   37.  The Court disagrees and recommends the exercise of jurisdiction exclusively under § 405(g).

8    The Supreme Court has not yet decided whether 42 U.S.C. § 405(h)—the portion of §

9   405 barring review "except as herein provided"—is the sole means of reviewing a decision of the

10   Commissioner of Social Security.  *See, e.g.*, *Yamasaki*, 442 U.S. at 698; *see also Heckler v.*

11   *Ringer*, 466 U.S. 602, 616 (1984) ("We have on numerous occasions declined to decide whether

12   the third sentence of § 405(h) bars mandamus jurisdiction over claims arising under the Social

13   Security Act[.]").

14    The undersigned agrees with plaintiff's primary argument that jurisdiction lies under

15   § 405(g).  Moreover, mandamus—which is an extraordinary remedy—is only available to

16   compel a federal official to perform a duty if "(1) the individual's claim is clear and certain; (2)

17   the officials' duty is non-discretionary, ministerial, and so plainly prescribed as to be free from

18   doubt; and (3) no other adequate remedy is available."  *Kildare v. Saenz*, 325 F.3d 1078, 1084

19   (9th Cir. 2003) (internal quotation marks and citation omitted).  Here, (3) is not satisfied because

20   it appears that an adequate remedy is available under § 405(g)—certifying the class defined

21   above and granting judgment in their favor of the plaintiff class, enjoining the Administration's

22   unconstitutional blanket denial of benefits to class members.

23

24

1    Plaintiffs argue that if the Court declines to include in the class definition those who have

2    yet to present claims to the Administration because of § 405(g)'s presentment requirement, then

3    jurisdiction must sound under § 1361 to afford those who have not-yet-presented claims full

4    relief.  Plaintiffs rely on *Briggs v. Sullivan*, 886 F.2d 1132, 1141–42 (9th Cir. 1989)—a case

5    holding that claimants with unexhausted claims may bring actions under § 1361.  As this case

6    involved claims that were presented to the Administration, it is not helpful here.  *See Briggs*, 886

7    F.2d at 1139.  Plaintiffs offer no authority to support the conclusion that a writ of mandamus lies

8    where claims have not been presented to the Administration.  Therefore, to the extent that they

9    argue that a remedy lies in mandamus for claims that were not presented to the Administration,

10    the undersigned is not persuaded.

11    For these reasons, the undersigned concludes that § 405(g) jurisdiction is sufficient to

12    provide complete relief to the parties and sees no reason to grant 28 U.S.C. § 1361 mandamus

13    relief to the National Committee—whose role in this case has been fulfilled simply by

14    "support[ing]" Ms. Thornton's claim.  *See* Dkt. 46, at 16.

15    Again, it should be noted that the National Committee does not seek to represent the class

16    for purposes of § 405 jurisdiction.  Because § 405 jurisdiction is appropriate and because the

17    National Committee neither seeks to be certified as a class representative nor to assert any claims

18    independent of its members—who are class members (*see* Dkt. 46, at 4, 16; Dkt. 53, at 11, 33)—

19    claims brought by the National Committee are redundant with those brought by the class.

20    Therefore, the undersigned recommends that the National Committee be dismissed as a party.

21    **CONCLUSION**

22    Based on these reasons, and the relevant record, the undersigned recommends that

23    plaintiffs' motion for class certification be granted and the class be defined as set forth above.

24

1    Plaintiff Thornton should be identified as the class representative, class counsel should be

2    appointed, and the court should issue a nation-wide **INJUNCTION** requiring the Administration

3    to consider whether survivors of same-sex couples who were denied their constitutional right to

4    marry would otherwise qualify for survivor's benefits.

5    Further, as to Ms. Thornton, personally, the court recommends that this matter be

6    **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) to the

7    Commissioner for further proceedings consistent with this Report and Recommendation.

8    Finally, the National Committee should be dismissed, as its function has been fulfilled.

9    **JUDGMENT** should be for **PLAINTIFF THORNTON** and the **CLASS** and the case

10    should be closed.

**OBJECTIONS**

12    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

13    fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

14    6. Failure to file objections will result in a waiver of those objections for purposes of de novo

15    review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

16    imposed by Rule 72(b), the clerk is directed to set the matter for consideration on February 21,

17    2020, as noted in the caption.

18    Dated this 31st day of January, 2020.

J. Richard Creatura
United States Magistrate Judge